## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT SCHILLING                         )
502 Berwick Court                        )
Charlottesville, VA 22901                )
                                         )
                    Plaintiff,           )
                                         )     Case No. 1:22-cv-162
         v.                              )
                                         )
SPEAKER OF THE UNITED STATES             )
HOUSE OF REPRESENTATIVES,                )
NANCY PELOSI                             )
U.S. Capitol, Room H-232,                )
Washington, DC 20515,                    )
                                         )
CLERK OF THE UNITED STATES               )
HOUSE OF REPRESENTATIVES,                )
CHERYL L. JOHNSON                        )
U.S. Capitol, Room H-154                 )
Washington, DC 20515–6601,               )
                                         )
CHIEF ADMINISTRATIVE OFFICER OF )
THE UNITED STATES HOUSE OF               )
REPRESENTATIVES,                         )
CATHERINE SZPINDOR                       )
The Capitol                              )
Washington, D.C. 20515,                  )
                                         )
                    Defendants.          )
_____ )

### PETITION FOR A WRIT OF MANDAMUS
### AND FOR DECLARATORY RELIEF

Plaintiff Robert Schilling ("Schilling") brings this action against the Speaker of the

United States House of Representatives Nancy Pelosi, Clerk of the United States House of

Representatives Cheryl L. Johnston, and Chief Administrative Officer of the United States

House of Representatives Catherine Szpindor, to compel compliance with the Plaintiff's

common law right of access to certain records pertaining to the use of outside private

1

donations, funds, or in-kind goods or services to conduct and support the activities of, or pay the expenses of, a congressional office in violation of House Rules.

Under the common-law right of public access, members of the public have the right to examine government records when the public interest in disclosure is greater than that in government secrecy. The United States Court of Appeals for the District of Columbia Circuit has held that the common law right of access extends beyond judicial records to the "'public records' of all three branches of government." *Ctr. For Nat'l Sec. Studies v. U.S. DOJ*, 356 U.S. App. DC 333, 351, 331 F.3d 918, 936 (2003), citing *Washington Legal Found. v. United States Sentencing Commission*, 319 U.S. App. D.C. 256, 89 F.3d 897, 903-04 (D.C. Cir. 1996). The legislative branch is subject to the common-law right of public access. *Washington Legal Foundation v. U.S. Sentencing Commission*, 89 F.3d 897 (D.C. Cir. 1996)(hereinafter "WLF II").

The D.C. Circuit has "conclude[d], as a matter of federal common law, that a 'public record'… is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived. *Id.,* at 905 (1996). When determining whether public records are subject to release under the common law right of access, "the court should focus upon "the specific nature of the governmental and public interests as they relate to the document itself, as well as the general public interest in the openness of governmental processes." *Washington Legal Found. v. United States Sentencing Comm'n*, 17 F.3d 1446, 1452 (D.C. Cir. 1994) (hereinafter "WLF I").

The common law right of access is of heightened importance when an element of adjudication is at play, as with Congressional oversight hearings and in particular instances, as illustrated below is the case here, in which sworn testimony has been compelled and subpoenas

have been issued (with more likely forthcoming according to the relevant congressional

leadership). The D.C. Circuit recognized, at the urging of the Executive Branch, that the

common law right of access is especially important with respect to documents "central to the

process of adjudication." *WLF* II, 89 F.3d at 901. In that case, the D.C. Circuit explained that the

policy supporting the right "is, according to the Government, that of ensuring open legal

proceedings and promoting public confidence in the legal process." As detailed, *infra*, the recent

use in purportedly adjudicative or investigatory proceedings of privately-funded or provided

professional staff adds ever further gravity to the public importance of these public records.

 Recently, in response to a request from Buzzfeed News, the House of

Representatives recognized the longstanding common law right of access by making records

available to journalists and the public, specifically certain congressional records which are

currently the subject of the Select Committee investigating the events of January 6, 2021. See,

e.g., Jason Leopold, BuzzFeed News, "The Capitol Police Granted Permits For Jan. 6 Protests

Despite Signs That Organizers Weren't Who They Said They Were," Sept. 9, 2021, accessible

at: https://www.buzzfeednews.com/article/jasonleopold/the-capitol-police-said-jan-6-unrest-on-

capitol-grounds) ("The release of the documents also marks a significant victory for

BuzzFeed News, which filed a lawsuit last February after the Capitol Police declined a

request for the permits. Attorney Jeffrey Light cited the 'common law right of access' to

public records, which maintains that the public has a basic right to review the records of its

government that are exempt [sic] from the Freedom of Information Act. The Capitol Police

opted not to fight the case.")

 However, with respect to Mr. Schilling's requests for access to records, the

Defendants have reverted to their initial stance in the BuzzFeed matter. Indeed, they have

failed to even acknowledge Mr. Schilling's requests for access to records, despite having

recently plainly acknowledged their duties to do so with respect to other requesters.

In this case, Mr. Schilling seeks relief in the form of mandamus and a judicial declaration of his right to access the records in question.  As grounds for his petition, Plaintiff alleges as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is a civil action which arises under the Constitution and common law of the United States, and 28 U.S.C. § 1361, because this is an action for mandamus compelling various governmental officials to perform their nondiscretionary duties.

2.      Further, this Court has jurisdiction pursuant to 2 U.S.C. § 4301(i)(3) and 22 U.S.C. 2201, *et seq*. because there is an actual controversy between the Plaintiff, who seeks records, and the Defendants, who have failed to provide such records or to acknowledge Plaintiff's rights to copies of such records or even acknowledge Plaintiff's requests.

3.      Further, this Court has jurisdiction pursuant to 2 U.S.C. § 4301(i)(3) and 22 U.S.C. 2201, *et seq*. because there is an actual controversy between the Plaintiff, who seeks records, and the Defendants, who have failed to provide such records or to acknowledge Plaintiff's rights to copies of such records or even acknowledge Plaintiff's requests.

4.      As the D.C. Circuit held in *Lovitky v. Trump*, 445 U.S. App. D.C. 186, 192, 949 F.3d 753, 759 (2020):

> "A court may grant mandamus relief only if: (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62, 390 U.S. App. D.C. 251 (D.C. Cir. 2010) (internal quotation omitted). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189, 421 U.S. App. D.C. 123 (D.C. Cir. 2016). In other words, "mandamus jurisdiction under § 1361 merges with the merits." *In re Cheney*,

406 F.3d at 729; *see also* 14 Helen Hershkoff, *Federal Practice & Procedure* § 3655 (4th ed. 2019) ("As many lower courts have recognized, whether jurisdiction exists under Section 1361 'is intertwined with the merits' because the existence of a legal duty owed to the plaintiff is critical to whether adjudicative power is present.")

5.     As the U.S. Supreme Court held in *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S. Ct. 2137, 2143 (1995), "By the Declaratory Judgment Act, Congress sought to place a remedial arrow in the district court's quiver…"

6.     In this suit, Mr. Schilling respectfully submits that the exercise of this Court's discretionary declaratory judgment power is especially important because the Defendants are agents of Congress and Congress itself has armed this Court with a quiver to use in vindicating Mr. Schilling's rights.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events and/or omissions giving rise to this claim took place in the District of Columbia and because the records that are the subject of this action are also likely located in the District of Columbia. Further, the named Defendants undertook the actions complained of in their capacity as officers and/or employees of the United States government.

## **PARTIES**

8.     Plaintiff Robert Schilling hosts The Schilling Show radio program broadcast on Newsradio 1070 and 98.9 FM WINA in Central Virginia. The show, and an additional podcast, are also streamed online. As the founder and editor of a news, analysis, and commentary web site, SchillingShow.com, Mr. Schilling has launched multiple national news stories, several of which have appeared on prominent national and international media outlets, and his reporting and investigative journalism has been awarded multiple times by the Associated Press and the Virginia Association of Broadcasters, including two "Superior

Awards for Best Investigative Reporting" from the Associated Press. Mr. Schilling's interest in the documents that are at issue in this case springs both from his active role as a citizen and from his role as a journalist, with a general and a public proprietary interest in obtaining and disseminating information. See, e.g., *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597-598 (1978) (noting that English cases conditioned the right of public access on an individual's proprietary interest in information, but that the American cases recognize a citizen's interest in keeping a watchful eye on his government.).

9.      Defendant Speaker of the U.S. House of Representatives Nancy Pelosi is the presiding officer of the House and is charged with numerous duties and responsibilities by law and by the House rules. As the presiding officer of the House, the Speaker maintains order, manages its proceedings, and governs the administration of its business. The Speaker manages the content of the House's Journal, as provided in Rule I of the House of Representatives. Pursuant to the House Rules, she appoints all committee members and signs all subpoenas issued by the House. Pursuant to Rule VI, the Speaker controls the conduct of all official reporters of the House, in conjunction with the Clerk. As such, and due to the appointment and general supervisory powers of the Speaker, Plaintiff states on information and belief that the Speaker of the House has constructive possession, custody, and control of the public records Plaintiff seeks, or alternatively that the Speaker or her appointees or subordinates are lawfully charged with having actual or constructive possession, custody, and control of such records in order to carry out her official duties. Plaintiff requested the records described herein from this Defendant, in a written request sent by certified mail, to which request the Defendant has chosen not to respond.

10.      Defendant Clerk of the U.S. House of Representatives Cheryl L. Johnson is an

administrative officer within the legislative branch. According to the House Rules II and VII, the Clerk of the U.S. House of Representatives is an administrative office within the legislative branch whose head, *inter alia*, "Acts as custodian of all noncurrent records of the House." According to the House Rules, the Clerk manages official reports of the House in conjunction with the Speaker, and is further required to retain in the official House Library a permanent set of the books and documents generated by the House. Under House Rule II, the Capitol Library operates under the Clerk's management. Further, pursuant to the U.S. Constitution, the House of Representatives is required to keep a journal of its proceedings. Art. I, § 5, and pursuant to 44 U.S.C. §901 *et seq*. and 44 U.S.C. § 713 *et seq*., the legislature has imposed a statutory obligation to maintain and publish journals of the proceedings of the house. As such, Plaintiff states on information and belief that the Clerk of the House has actual or constructive possession, custody, and control of the public records Plaintiff seeks in her official capacity for the purposes of carrying out her duties under the aforementioned legal authorities, or alternatively that she is lawfully required to have actual or constructive custody and possession of such records for said purposes. Plaintiff requested the records described herein both directly from the Defendant Clerk and from the Clerk's constituent Office of the Capitol Librarian, in written requests sent by certified mail. The Defendant Clerk and her subordinates have chosen to not respond.

      11.     Defendant Chief Administrative Officer of the U.S. House of Representatives Catherine Szpindor is an administrative officer within the legislative branch. According to the House Rules, including but not limited to Rule II, the Defendant Chief Administrative Officer has operational responsibility for functions as assigned by the Committee on House Administration. As such, and because the administration of the House necessarily includes the

maintenance of the official records of the House, Plaintiff states on information and belief that Defendant has possession, custody, and control of the public records Plaintiff seeks, or alternatively that she is lawfully required to have custody and possession of such records for said purposes. Plaintiff requested the records described herein from the Defendant Chief Administrative Officer, in a written request sent by certified mail. The Defendant Chief Administrative Officer has chosen not to respond.

12.     All defendants are sued as individuals in their official capacities only. Pursuant to *Fornaro v. James*, 367 U.S. App. D.C. 401, 407, 416 F.3d 63, 69 (2005), "No separate waiver of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a duty required in his official capacity." Further, pursuant to *Wash. Legal Found. v. United States Sentencing Comm'n*, 319 U.S. App. D.C. 256, 89 F.3d 897, 901 (1996), "If a plaintiff seeks a writ of mandamus to force a public official to perform a duty imposed upon him in his official capacity… no separate waiver of sovereign immunity is needed."

13.     Plaintiff Schilling alleges that he has a common law right of access to the records described herein and is entitled to the herein described relief, for the following alternative reasons, among others:

A.     To the extent that the Congress or certain of its members, officers, or employees have acted lawfully and within the bounds of established authority under the Constitution, statutory law, and applicable Congressional rules, Mr. Schilling is entitled to view the records because they represent the official proceedings of a branch of the United States government and the Defendants are not entitled to claim sovereign immunity in a suit for mandamus under the "so-called *Larson-Dugan* exception to sovereign immunity." See *Judicial*

*Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 311 (D.D.C. 2020).

**B.**    To the extent that the Congress or certain of its members, officers, and/or employees have acted outside the legal boundaries that apply in carrying out the actions described herein, Mr. Schilling is entitled to relief because governmental actors who act unlawfully are not clothed in sovereign immunity to the extent that they have acted outside the confines of their lawful authority or in an *ultra vires* manner. See *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690, 69 S. Ct. 1457, 1461 (1949) ("relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power.").

## STATEMENT OF FACTS

14.    On October 28, 2021, the United States House of Representatives Committee on Oversight & Reform ("the Oversight Committee" or "the Committee") held a hearing it titled "Fueling the Climate Crisis: Exposing Big Oil's Disinformation Campaign to Prevent Climate Action" ([https://oversight.house.gov/legislation/hearings/fueling-the-climate-crisis-exposing-big-oil-s-disinformation-campaign-to](https://oversight.house.gov/legislation/hearings/fueling-the-climate-crisis-exposing-big-oil-s-disinformation-campaign-to)), after having requested records from the entities whose executives were called to testify. News reports state that in the week prior to the hearing, Subcommittee Chairman and co-leader of the hearing California Representative Ro Khanna, and full Committee Chair Carolyn Maloney of New York, informed activists this was the first in a year-long series of events and expressed the prospect of the Committee pursuing "perjury" charges against witnesses. ("Maloney and Khanna, whose perjury warning came during a call this week with the political action group Our Revolution, will face challenges from the unusual nature of the event." Corbin Hilar, "Lawmakers study Big

9

Tobacco perjury before Big Oil showdown," October 27, 2021, E&E News,

https://www.eenews.net/articles/lawmakers-study-big-tobacco-perjury-before-big-oil-showdown-2/.)

15.     At that first hearing in October, reading from prepared remarks, Chairwoman Maloney condemned the witnesses for refusing that day to promise no further funding of disfavored speech or groups, including but not limited to industry trade associations; to stop engaging in disfavored public speech; or to produce "internal documents or internal communications" about their public speech. (Video at

https://www.youtube.com/watch?v=xchA94oDXmI.) The Chair then "announced her intent to issue subpoenas to" the witnesses for internal records to "the Committee's investigation into the fossil fuel industry's climate disinformation campaign."

(https://oversight.house.gov/news/press-releases/at-historic-hearing-fossil-fuel-executives-admit-climate-crisis-is-an-urgent). Subsequent to this, the Committee has scheduled a second hearing, and expressed an interest in issuing subpoenas to the witnesses called thereto. See, e.g., Maxine Joselow, "House panel broadens probe into climate disinformation by Big Oil," *Washington Post*, January 21, 2022, https://www.washingtonpost.com/climate-environment/2022/01/21/house-panel-broadens-probe-into-climate-disinformation-by-big-oil/?utm_source=Daily%20on%20Energy%20012122_01/21/2022&utm_medium=email&utm_campaign=WEX_Daily%20on%20Energy&rid=24768794&env=db4665f345665fde06a16543e17994e4637d11093879c8a1c80db9250f8b851b). ("Maloney added that she is prepared to subpoena the directors if they refuse to testify at the hearing, which is scheduled for Feb. 8, after ExxonMobil and Chevron have reported their fourth-quarter earnings. The panel has already wielded its subpoena power to demand thousands of pages of documents regarding

the fossil fuel companies' internal communications about climate change.")

16.     The Committee's announcement of the investigation referenced in Mr. Schilling's requests for information made no plausible claim of being "in furtherance of, a legitimate task of the Congress," *Trump v. Mazars USA, LLP*, 140 U.S. at 2031, citing *Watkins v. United States*, 354 U.S. 178, 187 (1957), but instead effectively confesses to seeking a scapegoat for Members of Congress who have failed to obtain popular support for legislative ambitions to fundamentally restructure society in the name of "climate change."

17.     For example, the first of the Committee's two posted rationales for the campaign to subpoena private parties' records in the investigation referenced by Mr. Schilling in his request for information makes this quite clear (bold in original): "**We are deeply concerned that the fossil fuel industry has reaped massive profits for decades while contributing to climate change that is devastating American communities, costing taxpayers billions of dollars, and ravaging the natural world," the Chairs wrote.  "We are also concerned that to protect those profits, the industry has reportedly led a coordinated effort to spread disinformation to mislead the public and prevent crucial action to address climate change."** https://oversight.house.gov/news/press-releases/oversight-committee-launches-investigation-of-fossil-fuel-industry.

18.     The Supreme Court has repeatedly made clear, including more than once during the McCarthy Era, that "Congress may not use subpoenas to 'try' someone 'before [a] committee for any crime or wrongdoing'," and that Congress has "no '"general" power to inquire into private affairs and compel disclosures,'" and no power to investigate the political activities or other speech or associations of U.S. citizens in order to run a parallel criminal probe or otherwise perform the law enforcement and criminal investigative function reserved

exclusively to the executive branch and the courts. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *McGrain v. Daugherty*, 273 U. S., at 179 and 173–174, respectively) (*Mazars* addressed the substantively distinct, "important issues concerning relations between the branches…involving congressional efforts to seek official Executive Branch information", or checks-and-balances. *Id*. at 2031).

19.      The Committee then offered one disconnected, *non sequitur* attempt in its announcement at purporting a legislative purpose behind investigating private parties for their opposition to a particular policy agenda (the "climate" agenda), that "**one of Congress's top legislative priorities is combating the increasingly urgent crisis of a changing climate," the Chairs added.  "To do this, Congress must address pollution caused by the fossil fuel industry and curb troubling business practices that lead to disinformation on these issues."** https://oversight.house.gov/news/press-releases/oversight-committee-launches-investigation-of-fossil-fuel-industry (bold in original).

20.      The public – including Mr. Schilling, in his role as an active citizen and journalist — has a great interest in seeing the record behind this weak rationalization to pursue political opponents and failure to even nominally ground a "year-long" investigation into private parties in a "valid legislative purpose." *Quinn v. United States*, 349 U.S. 155, 161 (1955)(see also, e.g., *Watkins v. United States*, 354 U.S. 178, 200 (1957) ("the mere semblance of legislative purpose would not justify an inquiry in the face of the Bill of Rights."). The history of these political investigations affirms this interest.

21.      A prior, similar effort by state and territorial attorneys general in 2016 cited the same rationale for investigating the same industry, indeed largely the same parties targeted by the Committee, which very soon extended to subpoenaing other private parties and targeting of more than 100 research and advocacy groups, scientists and other private

parties and entities.[1] Those subpoenas were withdrawn when challenged as facially improper

violations of First Amendment rights. See, e.g., "First Amendment Fight: CEI's Climate

Change Subpoena," April 20, 2016, https://cei.org/publication/first-amendment-fight-ceis-

climate-change-subpoena/.

22.     As documented by Plaintiff and another party in two detailed complaints filed

before the House Inspector General and Office of Congressional Ethics, available at

https://govoversight.org/wp-content/uploads/2022/01/Complaint-to-House-Inspector-

General.pdf and https://govoversight.org/wp-content/uploads/2022/01/Complaint-to-Office-

of-Congressional-Ethics.pdf, respectively, both the aforementioned investigation by state and

territorial officials and the Committee's investigation were prompted and assisted by outside

activists, including even some of the very same outside activists, who are seeking to deploy

government against political opponents. Plaintiff states on information and belief that the

latter effort launched by a congressional committee represents a relocation and resumption of

the former effort launched then and then abandoned by state and territorial prosecutors.

23.     The interest of the public and Mr. Schilling in the records at issue in this case

is heightened by media reports quoting Oversight Committee leadership and outside activists

acknowledging that certain of the professional staff work executing this investigation is

apparently being performed by consultants, and that these consultants appear to have been

provided to the Committee for this purpose by private donors.

24.     As Plaintiff noted in the aforementioned detailed complaints filed with

---

[1] *See, e.g.,* Valerie Richardson, "Exxon climate change dissent subpoena sweeps up more than 100 U.S. institutions", Washington Times, May 3, 2016, https://www.washingtontimes.com/news/2016/may/3/virgin-islands-ag-subpoenas-exxon-communications/; Walter Olson, "Massachusetts AG to Exxon: hand over your communications with think tanks", June 16, 2016, https://www.overlawyered.com/2016/06/+setts-ag-exxon-hand-communications-think-tanks/.

congressional watchdog offices, this investigation also represents an extension of what media reports, principals' own websites, and information released to various organizations under sunshine laws clearly establish is a practice of public-private collaborations to deploy judicial or quasi-judicial functions of government against political opponents of a particular policy agenda (the "climate" agenda). See, e.g., "Private Funders, Public Institutions: 'Climate Litigation and a Crisis of Integrity," Government Accountability & Oversight, P.C., May 18, 2021, available at https://climatelitigationwatch.org/wp-content/uploads/2021/05/GAO-EPA-CCI-RFF-Climate-Paper.pdf.

25.     When these privately financed and privately arranged "investigations" take place under the auspices of state governors' offices or state attorneys general offices where the public record amply documents this is occurring, the propriety of these arrangements is governed by state- and office-specific law and regulations.

26.     However, the U.S. House of Representatives' own rules (House Rule XXIV, Limitations on Use of Official Funds), and federal law (31 U.S. Code § 1342 - Limitation on voluntary services) prohibit the use of outside private donations, funds, or in-kind goods or services to conduct and support the activities of, or pay the expenses of, a Congressional office. This is further affirmed by official interpretations of these provisions (see, *infra*).

27.     As such, the record of these machinations is of ever more heightened public interest. Mr. Schilling seeks information that might reveal malfeasance in the House of Representatives. As a citizen Mr. Schilling is troubled by what he believes these records will reveal about private staffing of Congressional investigations, and as a journalist he is duty-bound to make the full record known to the American people.

28.     The House of Representatives' rules and 2 U.S.C. § 4301 define the role of

"consultants" and make clear that the donor-provided professionals working with the Oversight Committee are consultants. These same rules and U.S. Code provision require formal approval of (and public access to) the record of approving and engaging consultants.

29.     Despite Plaintiff having requested records which would document the approval of consultants to work on the aforementioned issues, Defendants have refused or otherwise failed to provide any such record. Indeed, the House Committee on Administration, which the House Rules charge with maintaining records of such approvals and making such records available to the public, asserted to Plaintiff on January 10, 2022, that it had no such records.

### Background to Oversight Committee "Year-long" Investigation, Subpoenas

30.     The relevant public record, including but not limited to statements by Oversight Committee leadership, exposes as pretextual any claim that the House intervention in this ongoing campaign is permissible under either of the two legitimate uses of Congress's investigative and subpoena powers, to wit: 1) to gather information to help lawmakers write or rewrite laws, or 2) to assert oversight over executive branch agencies as part of the constitutional system of checks and balances.

31.     It is thoroughly manifest that investigating those who Members of Congress and/or their allies feel have frustrated their legislative ambitions, and demanding an end to certain political speech, is not such a legitimate use of these powers; it is equally clear that efforts between the two to use Congress's investigative and subpoena powers to pursue those opponents who have frustrated them are of great public interest.

32.     Plaintiff states on information and belief, including without limitation information cited herein, that recent and upcoming Congressional hearings are the latest in a

series of public-private collaborations to deploy judicial or quasi-judicial functions of government against political opponents of the "climate" agenda, to assist private and governmental tort, "consumer fraud", and other litigation targeting private parties' climate-related speech[2], and, at least in part, to pretextually instigate or assist a criminal probe or probes of political opponents of the "climate" policy agenda.

33.     The public record also affirms this campaign extended beyond state attorneys general to calls by elected officials for, and inquiry by the U.S. Department of Justice into, use of the Racketeer Influenced and Corrupt Organizations ("RICO") Act against opponents of the "climate" agenda. (See, e.g., March 2016 colloquy between Sen. Sheldon Whitehouse (D-RI) of the Senate Judiciary Committee and then-Attorney General Loretta Lynch at https://www.c-span.org/video/?c4584506/user-clip-lynch-doj-discussed-lnvestigating-big-oils-climate-denial.) Subsequent to this, the Biden-Harris presidential campaign promised that, if elected, "Biden will instruct the Attorney General to… strategically support ongoing plaintiff-driven climate litigation against polluters" (https://joebiden.com/environmental-justice-plan/).

34.     Whether or not the new round of hearings described, *supra*, is aimed at engineering referrals to the Department of Justice as part of that intervention by the Attorney General promised by the Biden-Harris campaign, Plaintiff states on information and belief that the records sought in this case reflect an expansion, to the federal legislative branch, of

---

[2] See, e.g., Findings of Fact and Conclusions of Law, Exxon Mobil Corporation, Petitioner, Cause No. 096- 297222-18, District Court of Tarrant County, TX, April 25, 2018, https://climatelitigationwatch.org/wp-content/uploads/2019/10/Tarrant-County-Facts-and-Conclusions.pdf; See also, Proposed Amicus Curiae Brief of Energy Policy Advocates, *State of Minnesota v. American Petroleum Institute*, United States Court of Appeals for the Eighth Circuit, 21-1752, https://climatelitigationwatch.org/wp-content/uploads/2021/08/622288_EPA-amicus_brf.pdf.

those previous "Lawfare"[3] initiatives targeting disfavored, protected speech, and those who engage in it.

### Private, Off-Books Congressional Staff

35.     Plaintiff states on information and belief, including from statements by Committee leadership and certain activists not limited to those cited herein, that the Committee's new hearings are also privately staffed, arranged, and/or supported by "consultants" provided to the Committee for this purpose by private donors.

36.     Plaintiff states on information and belief that the Oversight Committee has engaged these consultants without following the lawful process for doing so set forth in House Rule 24 and 2 U.S.C. § 4301, which includes a required proposal, approval of such proposal, and posting for public inspection of agreements reflecting the consultants' provision of official functions.

37.     According to news reports, "[Rep.] Khanna said the committee has enlisted the aid of 'a lot of people' involved in planning the Waxman hearings for advice and planning." Zack Burdyk, "Democrats call for oil company executives to testify on disinformation campaign," *The Hill*, September 16, 2021, https://thehill.com/policy/energy-environment/572612-democrats-call-for-oil-company-executives-to-testify-on.

38.     Plaintiff states on information and belief, including based upon Chairman Khanna's admissions and other materials in the public domain,[4] that among the outside

---

[3] See, e.g., Memorandum Opinion by Justice Kerr, *San Francisco, et al., V. Exxon Mobil Corp,* Court of Appeals for the Second Appellate District (TX), No.02-18-00106-CV, at p. 48, https://eidclimate.org/wp-content/uploads/2020/06/1284000-1284588-02-18-00106-cv-majority-opinion-kerr.pdf, now pending as *Exxon Mobil Corp. v. City of San Francisco, et al.*, Tx. Sup. Ct. 20-0558.

parties brought in as consultants to execute this new quasi-judicial pursuit of private parties

are individuals operating through and as part of an organization called Co-Equal.

39.    Co-Equal's website boasts that the entity was established — as a project of

what media reports describe as a "Democratic Dark Money Juggernaut," "the 'mothership'

behind a network of Democratic dark money nonprofit groups"[5] — to provide consulting

services to burnish the staffs of congressional allies. https://www.co-equal.org/need ("Co-

Equal can help balance the scales… It can provide strategic advice on the legislative process

and oversight. And it can connect congressional offices with experts who can level the

information playing field.")

40.    Media coverage announcing Co-Equal's formation described it as "funded by

donors …to consult with congressional aides seeking guidance on messaging or how to move

ahead with inquiries." Carl Hulse, "Congressional Veterans Pitch In to Rebuild Oversight

---

[4] For example, see a memorandum written by two "people involved in planning the Waxman hearings" Phil Barnett and Phil Schiliro who are publicly listed as having founded and being provided to congressional offices through Co-Equal, FN 6, *infra*.

[5] Co-Equal's website also acknowledges it operates under the umbrella of Arabella Advisors ("Co-Equal is a project of the Hopewell Fund, a 501(c)(3) public charity. Co-Equal Action, is a project of the Sixteen Thirty Fund, a 501(c)(4) social welfare organization", and Sixteen Thirty Fund is a part of Arabella (see https://www.arabellaadvisors.com/expertise/fiscal-sponsorship/). Arabella is described in news reports as "the 'mothership' behind a network of Democratic dark money nonprofit groups," a "Democratic Dark Money Juggernaut". Andrew Kerr, "Democratic Dark Money Juggernaut Called Security On Watchdog Instead Of Releasing Their Tax Information," DailyCaller.com, November 16, 2021, https://dailycaller.com/2021/11/16/caitlin-sutherland-arabella-advisors-form-990s/. See also, e.g., Joe Schoffstall, Cameron Cawthorne, "Liberal dark money juggernaut raises $1.6 billion to flood left-wing groups with cash, tax forms reveal," Fox News, November 27, 2021, https://www.foxnews.com/politics/dem-dark-money-juggernaut-raises-1-6-billion-flood-liberal-groups-cash-tax-forms; "Big Money In Dark Shadows: The Arabella Advisors' Half-billion-dollar 'Dark Money' Network,'" Capital Research Center, April 29, 2017, https://capitalresearch.org/article/crc-exposes-left-wing-dark-money/; Editorial, "Questions for Senator Whitehouse A chance to ask the Democrat about his ties to 'dark money'", Wall Street Journal, September 21, 2020, https://www.wsj.com/articles/questions-for-senator-whitehouse-11600729418?mod=opinion_lead_pos1.

Muscle," *New York Times*, June 22, 2019,

https://www.nytimes.com/2019/06/22/us/politics/congress-oversight-muscle.html.

41.     That same media coverage, which did not address the permissibility of the

practice being profiled, did apparently report that it has not in fact been done previously,

stating that Co-Equal's consultants were "volunteer[ing] their skill set to the House and

Senate as Congress rebuilds its oversight muscle" and that this was a "unique approach." *Id*.

(Under House Rules, "volunteer" is a specifically defined term, which is used to describe

parties seeking educational benefit and who serve "without compensation from any source."

This does not apply to the aforementioned arrangement. See, e.g., House Committees'

Congressional Handbook, Volunteers, pp. 7-8, House Ethics Manual at p. 288, and FN 11,

*infra*; see also, Hulse, "Congressional Veterans Pitch In to Rebuild Oversight Muscle," *New

York Times*).

42.     Two "people involved in planning the Waxman hearings", which is Chairman

Khanna's description of some parties he has enlisted in the Committee's investigation, and

who also were profiled in the *New York Times* as offering to "rebuild oversight muscle" for

congressional offices, Phil Barnett and Phil Schiliro, explained in part their offering of

consulting to elected officials, on the "climate" issue, in an untitled June 15, 2017,

Memorandum[6] when offering their consulting services to also assist ideologically aligned

governors' offices.

43.     An email from one of those governors' aides to peers in other governors'

offices, released under state-level open records law, show the aide justifying to colleagues the

pursuit of private, off-books staffing of elected officials' climate campaigning with "it can't

---

[6] Memorandum and associated correspondence released under Washington State's Public
Information Act are available at https://climatelitigationwatch.org/wp-
content/uploads/2021/12/The-Phils-Pitching-Their-Influence.pdf.

always be us staff" staffing elected officials. [7] Those same governors' aides boasted in other emails among themselves of a "plethora of advocate and funder interest" in the project, and set forth a private budget of $50 million per year for off-books work for governors' climate advocacy.[8]

      44.    A January 2018 *Wall Street Journal* editorial on the effort to privately staff governors' offices noted, *supra*, asked a question relevant to the instant matter:

> "World Resources Institute spokesman Michael Oko says that "public-private partnerships enable governments to hire [*sic*] experts to advise them on policies that benefit their constituents," adding that they are "common across the political spectrum." Oh? If this is common practice, Washingtonians deserve more details about which outside groups fund [Washington Governor Jay] Inslee's policy team. Substitute the Koch brothers for the World Resources Institute, and the outrage would be predictable. This setup creates real concerns about accountability and interest-peddling. [Inslee advisor, employed by an outside activist group] Mr. [Reed] Schuler knows who pays him, and it's not Washington taxpayers.... Where else are such special interest groups paying to influence policy?"[9]

      45.    Plaintiff asserts on information and belief that the House Committee on Oversight & Reform enterprise described, *supra*, is one such place and, given the clear prohibition on this practice at the Congressional level, in both statute and House Rules, the records at issue here will educate the public on a matter of great public importance.

---

[7] Email available at https://climatelitigationwatch.org/wp-content/uploads/2018/09/It-cant-always-be-us-staff-copy.pdf. This and other records available at Christopher Horner, "Government for Rent," Competitive Enterprise Institute, September 2018, https://cei.org/sites/default/files/Christopher%20Horner%20-%20Government%20for%20Rent_0.pdf.

[8] Budget for this staffing effort and transmittal email released under Washington State's Public Records Act available at https://climatelitigationwatch.org/wp-content/uploads/2018/09/FN-12-Dan-Carol-sends-USCA-slides-and-budget-copy.pdf. See also, Horner, "Government for Rent," Competitive Enterprise Institute, September 2018.

[9] Editorial, "Climate of Unaccountability," *Wall Street Journal*, January 11, 2018, https://www.wsj.com/articles/climate-of-unaccountability-1515717585.

46.     Public records show a similar operation by which at least eleven state

attorneys general offices also have brought in at least eighteen privately hired and paid

attorneys to conduct "climate" investigations and litigation against political opponents and

under the auspices of those offices' authorities, to, *inter alia*, assist private tort litigation, if

the office promises to "advanc[e] progressive clean energy, climate change, and

environmental legal positions" and demonstrate it "needs additional attorney resources to

assist" advancing this agenda.[10]

47.     Plaintiff also states on information and belief that the aforementioned

arrangements are often prohibited by relevant ethics laws and rules and, where not prohibited,

are subject to certain approval and disclosure requirements, which requirements have not

always been followed.

48.     For example, House Rule 24 prohibits this practice. The House Committee on

Ethics interprets "RULE XXIV, LIMITATIONS ON USE OF OFFICIAL FUNDS,

Limitations on use of official and unofficial accounts", in pertinent part:

> "Proper Performance of Congressional Duties… the provisions of the House Rules
> prohibiting unofficial office accounts generally preclude Members from accepting
> privately financed or unpaid services (as well as other in-kind support) for the
> performance of official House business (House Rule 24, cl. 1).  Accordingly, a staff
> person should not perform congressional duties during time for which the individual
> is being compensated by a private outside employer, and should not use any resources
> of a private outside employer for the performance of congressional duties."

Laws, Rules, and Standards of Conduct, House Committee on Ethics,

https://ethics.house.gov/outside-employment-income/laws-rules-and-standards-conduct.

---

[10] See, "State AGs for Rent: Privately funded litigators wield state police power", *Wall Street
Journal*, November 6, 2018, https://www.wsj.com/articles/state-ags-for-rent-1541549567, and
Christopher Horner, "Law Enforcement for Rent", Competitive Enterprise Institute, August
2018, https://cei.org/sites/default/files/Christopher%20Horner%20-
%20Law%20Enforcement%20for%20Rent%20with%20Appendix.pdf.

49.     The House Ethics Committee also writes: "House Rule 24 prohibits 'unofficial office accounts.' Accordingly, outside private donations, funds, or in-kind goods or services may not be used to support the activities of, or pay the expenses of, a congressional office. Only appropriated funds or Members' personal funds may be used for this purpose. House Rule 24 has been in effect since 1977.  Congress codified this rule into law governing both Chambers as part of the Legislative Branch Appropriations Act, 1991."

https://ethics.house.gov/official-allowances/unofficial-office-accounts, citing to  31 U.S.C. § 1342 (prohibiting acceptance of voluntary services without specific authorization (augmentation of appropriations), Limitation on voluntary services, "An officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property."

50.     Whatever the role of these outside, private operatives in executing quasi-judicial pursuits of opponents through public institutions, they have a status which should be definable within the applicable rules and, in part given those rules, should be known to the public, for whom the consultants are unofficially but nonetheless *de facto* working.

51.     The U.S. House of Representatives' rules (https://www.govinfo.gov/content/pkg/CPRT-117HPRT43153/pdf/CPRT-117HPRT43153.pdf), are also interpreted and applied by the House Committee on Administration, which interpretation prescribes with specificity the requirements for use of Consultants, in addition to the House Rules and U.S. Code provisions prohibiting the free

provision of professional staff services with certain, clearly defined exceptions none of which apply here.[11]

52.    The Committee makes clear in its House Committees' Congressional Handbook, Consultants, pp. 13-14,  the Rules' requirement that Consultants may not perform duties of professional staff, that they must be contracted for, and that those contracts must be subject to an open approval process and public scrutiny (emphases added):

> **Consultants**
>
> Pursuant to 2 U.S.C. § 4301, each Committee is authorized, **with the prior approval of the Committee on House Administration**, to obtain *temporary or intermittent services of individual consultants or organizations, to advise the Committee with respect to matters within its jurisdiction.*
>
> 1. The term of the contract agreement may not exceed 12 months or the end of a Congress, whichever occurs first.
>
> 2. The consultant is to act as an independent contractor and is not an employee of the Committee. The Committee on House Administration will not approve a contract if the services to be provided by the consultant are the regular and normal duties of Committee staff….
>
> 6. Pursuant to House Rule XXIII, clause 18(b), consultants are subject to certain provisions of the House Code of Official Conduct, including the gift rule, the prohibition against use of one's official position for private gain, and the requirement to conduct oneself at all times in a manner that reflects creditably on the House. For information relative to the House Rules, contact the Committee on Ethics at x57103.
>
> 7. **Committee Chair must submit a letter requesting approval of the Committee on House Administration along with a signed contract agreement and resume of the proposed consultant**, including, but not limited to, details of federal service either as an employee or pursuant to contract agreement with any Committee of the Congress.

---

[11] https://cha.house.gov/member-services/handbooks/committees-congressional-handbook#committee%20staff_volunteers. **Detailees** must come "from a Government department or agency"; Regarding **Contractors**, "Committees may contract with firms or individuals only for general, non-legislative and non-financial office services (e.g., equipment maintenance, systems integration, data entry, staff training)"; and, "The term "**volunteer**" means an individual performing service in a House office without compensation from any source. The voluntary service should be of significant educational benefit to the participant and such voluntary assistance should not supplant the normal and regular duties of paid employees." (emphases added).

8. **The letter must specify that the proposed contract has been approved by a majority of the Members of the requesting Committee and that no services pursuant to the proposed contract will commence prior to approval of the contract by the Committee on House Administration**.

*The Committee on House Administration will make available for public inspection a copy of the qualifications of each consultant.*[12]

53.     Plaintiff states on information and belief including, without limitation, information in the public domain and authorities cited herein, that the parties conducting and supporting the activities of a congressional office as described herein are *de facto* and *de jure* Consultants.[13]

54.     Plaintiff also alleges on information and belief that any claim by Defendants that the above-described parties are not consultants for the reason that the Oversight Committee elected to not comply with these requirements for engaging consultants is circular logic with no impact on these parties' actual status.

55.     Plaintiff Schilling requested from the Committee on House Administration all requests for approval and contracts for consultants by the House Committee on Oversight & Reform in the current Congress. Plaintiff wrote, in pertinent part:

---

[12] https://cha.house.gov/member-services/handbooks/committees-congressional-handbook#employment%20law_consultants; full Handbook available at https://cha.house.gov/sites/democrats.cha.house.gov/files/documents/116th%20Committee%20Congressional%20Handbook_1.pdf.

[13] In the event Defendants claim the consultants referenced herein and who are the subject of the requests at issue in this matter are merely extraordinarily successful lobbyists, Plaintiff notes that none of the parties whom Plaintiff states on information and belief are serving in this capacity, or the organizations providing these staff, are registered as lobbyists according to late December 2021 searches of the House Clerk's website (https://lobbyingdisclosure.house.gov/lookup.asp). See also, "Co-Equal is funded by donors, and those who enlist with it are available to consult with congressional aides seeking guidance on messaging or how to move ahead with inquiries in the face of stiff White House resistance. One requirement of participating is that the staff cannot be engaged in any lobbying." Hulse, "Congressional Veterans Pitch In to Rebuild Oversight Muscle," *New York Times*, June 22, 2019.

Pursuant to 2 U.S.C. § 4301(i), and the House Committees; Congressional Handbook, Consultants, p. 14, The Committee on House Administration will make available for public inspection a copy of the qualifications of each consultant" engaged by a House Committee, or its subcommittees, "to obtain intermittent services of individual consultants or organizations, to advise the Committee with respect to matters within its jurisdiction."

Pursuant to those same authorities I request copies of or an appointment to publicly inspect all qualifications for each consultant for or to the House Committee on Oversight & Reform or any of its subcommittees during the 117th Congress. It appears that this information is the information described in the House Committees' Congressional Handbook, Consultants, p. 14 ¶¶ 7-8: (text of ¶¶ 7-8, *supra*, omitted).

56.     On January 10, 2022, the Majority Counsel of the House Committee on

Administration wrote to Plaintiff stating, *in toto*, "[w]e do not have any such documents."

57.     As such, Plaintiff states on information and belief that the Committee on

Oversight & Reform has not proceeded with the consultants described, *supra*, according to

the process set forth in the House Committees' Congressional Handbook, Consultants, p. 14

¶¶ 7-8, House Rule 24 and/or 2 U.S.C. § 4301.

58.     As with the Federal Bureau of Investigations' now infamous Operation "Crossfire

Hurricane,"[14] here the public has an intense interest in records illuminating the role that privately

afforded consultants played in engineering compelled testimony and subpoenas to private parties, in the

latest in a series of such endeavors targeting political opponents with the partial staffing by outside,

donor-provided consultants, possibly without properly contracting with and disclosing the relationship

between such parties and the Congress as required by law, or, alternately, neither obtaining approval of

nor posting the required consultant agreements.

---

[14] See, Office of the Inspector General, U.S. Department of Justice, "Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation," December 2019 (Revised), https://www.justice.gov/storage/120919-examination.pdf.

## MR. SCHILLING'S COMMON LAW RIGHT OF ACCESS REQUEST FOR RECORDS

59.     Because of Mr. Schilling's concerns with the aforementioned Congressional

hearings, which appear to have been convened for improper purposes, and because of Mr.

Schilling's knowledge of information in the public domain and from news reports which

indicates the troubling possibility that privately-funded staff were being provided to the

Congress to support such improper legislative inquiries, Mr. Schilling resolved to request

information which would shed light on the activities of his government and allow him to

further educate the public in his role as a journalist. Specifically, Mr. Schilling sent the

requests for records that are described below in paragraphs 60 through 64.

60.     On December 1, 2021, by certified mail, Plaintiff submitted a written request

to Defendant Speaker of the House of Representatives Nancy Pelosi for copies of the

following public records, by certified mail, received by Defendant on December 16, 2021,

according to the assigned tracking number and USPS.com:

> 1. Email communications between i) Aria Kovalovich, Chairwoman Carolyn Maloney, and/or Rep. Rho Khanna that ii) also include as a party (to, from, cc: or bcc) a) Geoffrey Supran, Naomi Oreskes, Phil Barnett, Phil Schiliro, and/or Robert Brulle, and/or b) any email address ending with @sheredling.com, @ag.ny.gov, or .edu.
>
> In addition to email correspondence this also includes but is in no way limited to Zoom, Teams, Skype or other meeting- and/or scheduling-related messages.
>
> 2. Recordings of any Zoom, Teams, Skype or other video meetings which included Aria Kovalovich, Chairwoman Carolyn Maloney, and/or Rep. Rho Khanna and also include Geoffrey Supran, Naomi Oreskes, Phil Barnett, Phil Schiliro, and/or Robert Brulle, and/or any party using an email address ending with @sheredling.com, @ag.ny.gov, or .edu.
>
> The timeframe of both requests is from September 1, 2021, through November 8, 2021.

61.     In addition to covering the two individuals affiliated with Co-Equal and

apparently described by Chairman Khanna, the request also covered individuals who have

publicly asserted their assistance, and/or been identified by Chairman Khanna as providing their assistance, to the Committee's investigation.

62.     On December 1, 2021, Plaintiff submitted a request to Defendant Clerk of the House Cheryl L. Johnson for copies of the same records by certified mail, received by Defendant Johnson on December 16, 2021, according to the assigned tracking number and USPS.com.

63.     On November 18, 2021, Plaintiff also had submitted a request to one of the Clerk of the House's constituent offices, the Office of the Capitol Librarian (also known as the House Librarian), for copies of the same records. This request was also sent via certified mail, and was received by the Librarian on November 23, 2021, according to the assigned tracking number and USPS.com.

64.     On November 18, 2021, Plaintiff submitted a request to Defendant Chief Administrative Officer of the House Catherine Szpindor for copies of the same records by certified mail, which request was received by Defendant Szpindor on November 22, 2021, according to the assigned tracking number and USPS.com.

65.     As of the date of this Complaint, none of the Defendants have produced the requested records to Plaintiff or even acknowledged his requests.

## <u>COUNT I</u>
### Common Law Right of Access

66.     Plaintiff realleges the preceding and subsequent paragraphs as if fully stated herein.

65.     Defendants are in violation of their obligations under the common law right of access to public records. Specifically:

a) The Speaker of the House has failed to provide to Mr. Schilling the records he requested, as specifically described elsewhere herein, and otherwise failed to in any way respond to Mr. Schilling. Alternatively and/or additionally, the Speaker has failed to perform her duties under relevant law to accurately compile, archive, and/or maintain the records of the House which Mr. Schilling has requested or to ensure that the Congressional Record and/or the Journal of the House contain the full and accurate details regarding the activity of the House as described herein.

b) The Clerk of the House has failed to provide to Mr. Schilling the records he requested, as specifically described elsewhere herein, and further failed to in any way respond to Mr. Schilling. Alternatively and/or additionally, the Clerk and/or the Clerk's subordinates, including bit not limited to the House Librarian, has failed to perform her duties under relevant law to accurately compile, archive, and/or maintain the records of the House which Mr. Schilling has requested.

c) The Chief Administrative Officer of the House has failed to provide to Mr. Schilling the records he requested, as specifically described elsewhere herein, and has further failed to in any way respond to Mr. Schilling. Alternatively and/or additionally, the Chief Administrative Officer has failed to perform her duties under relevant law to accurately compile, archive, and/or maintain the records of the House which Mr. Schilling has requested.

66.    The requested communications and are public records because they were created or received by an agency of the legislative branch and/or by legislative branch officials for the purpose of recording official actions including but not limited to the engagement of consultants. In addition, the requested communications pertain to the House exercise of quasi-judicial functions and, as acknowledged in public admissions, represent the collaboration

between governmental employees and private-activist consultants and their funders to deploy quasi-judicial governmental pursuits of political opponents, and are of legal significance.

67.     Mr. Schilling's interest and the public interest in the requested communications outweighs Defendants' interest in keeping them secret.

68.     The Defendants and each of them have a non-discretionary duty to make these public records available upon request for the reasons cited herein, including, without limitation, under the Common Law Right of Access, under the U.S. Constitution, and under the statutory provisions and House Rules cited above. Indeed, this Court has held that "Should the common-law right of access apply to the requested records, then [Congress's] exercise of discretion … whether to release those records to plaintiff would be cabined… by the legal duty or obligation to fulfill plaintiff's request." *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 312-13 (D.D.C. 2020)

69.     Plaintiff is being irreparably harmed by Defendants' violations, and Plaintiff will continue to be irreparably harmed unless Defendants are compelled to comply with the law.

70.     Plaintiff has no adequate remedy at law. Mandamus or an appropriate mandatory injunction is the appropriate remedy because the Defendants are in possession of records to which the Plaintiff is entitled as a citizen, a journalist, or both.

71.     "The necessary prerequisites for this court to exercise its mandamus jurisdiction are that '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *Swan v. Clinton*, 321 U.S. App. D.C. 359, 100 F.3d 973, 991 (1996).

72.     In this case, Mr. Schilling has a clear right to relief both as a citizen and as an interested journalist, for reasons that include but are not limited to the reasons that follow:

a) The records at issue were generated by the legislative branch in carrying out its official functions.

b) The records at issue were generated by the legislative branch in engaging consultants, an activity and the public nature of which are governed by statute and House Rule.

c) The records at issue are quasi-judicial or adjudicative in nature, insofar as they were generated as part of the Congressional oversight process, whether legitimately or pretextually. As such, the common law presumption of access is heightened.

d) In Mr. Schilling's role as a citizen, he has an interest in keeping a watchful eye on his government.

e) In Mr. Schilling's role as a journalist, he has a proprietary interest in obtaining information which can be used to educate the public about the activities of its government.

73.     In this case, Defendants have a clear duty to act. Specifically:

a) The Speaker of the House has an obligation under the Rules of the House to ensure that the Journal of the House and the Congressional record are accurate and complete. The Speaker further has the duty, in conjunction with the Clerk of the House, to ensure that the official reporters accurately report the proceedings of the House and its committees. Further, the Speaker of the House has the obligation under the House rules to appoint committee members and to issue subpoenas following only particular protocols set forth in such rules.

b) The Clerk of the House has the duty to maintain the records of the House, to include the Journals of the House and its other records. Further, she has an obligation under the Rules of the House to ensure that the Journal of the House and the Congressional record are accurate and complete. Through the Librarian of the House, the Clerk has the duty to maintain the records of the house and to make them available for various purposes under the House rules or when required by applicable law, including but not limited to when required by the Common Law Right of Access. The Clerk further has the duty, in conjunction with the Speaker of the House, to ensure that the official reporters accurately report the proceedings of the House and its committees.

c) The Chief Administrative Officer of the House has the duty under the House Rules to administer the administrative affairs of the House both in the general sense and specifically with respect to audits. The Administration of the House necessarily includes maintaining records and providing them when required by the applicable law, including but not limited to the Common Law Right of Access and 2 U.S.C. § 4301. Further, the administration of the House and the implied or express duties of the Chief Administrative Officer necessarily include answering correspondence addressed to the Chief Administrative Officer.

d) All of the Defendants have a duty to respect Mr. Schilling's Constitutional right to petition his government and to respond to correspondence in furtherance of that rights.

74.     In this case, Plaintiff Schilling has no other relief available to him. Like the judicial branch, Congress is not subject to the Freedom of Information Act. Yet the materials, which inarguably reflect the official activity of Congress, are not found in the Congressional record or in the Journal of the House, nor are certain among these records held, as relevant and

described, *supra*, by the House Committee on Administration. Mr. Schilling and the public at large will be left in the dark if not for the issuance of a writ of mandamus under the Common Law Right of Access.

## COUNT II
### Declaratory Judgment

75.     Plaintiff incorporates by reference the foregoing and subsequent paragraphs by reference as if fully set forth herein.

76.     Plaintiff asserts that he is entitled to inspect and/or copy the records he requested from the Defendants, as specifically set forth above in ¶¶60-64.

77.     Defendants have failed to acknowledge Plaintiff's requests or to provide the requested records. As such, Defendants have constructively denied Mr. Schilling's request for records. Alternatively and/or additionally, Defendants have constructively communicated through their inaction their collective and individual belief that they are not bound by any duty to provide the requested records.

78.     A dispute and controversy between the parties exists within the meaning of Fed. R. Civ. P. 57, 28 U.S.C. §2201.

79.     Mr. Schilling is entitled to a declaration that the documents he seeks are available to him under the common law right of access and that the Defendants are bound to provide him access to such records.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

(a) declare that Defendants' refusal to release the requested public records is a violation of the common law right of access to public records;

(b) issue a writ of mandamus or other mandatory injunction compelling Defendants to

carry out their non-discretionary duty to make all of the requested records available;

(c) award Plaintiff its costs and reasonable attorneys' fees in this action; and

(d) grant Plaintiff such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands trial by jury of any and all issues which are so triable.

Dated: January 24, 2022                        Respectfully submitted,

ROBERT SCHILLING
By Counsel:

/s/*Matthew D. Hardin*
Matthew D. Hardin
Hardin Law Office
1725 I Street NW, Suite 300
Washington, DC 20006
(202) 802-1948
HardinLawPLLC@icloud.com