**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT SCHILLING**, <br><br> Plaintiff, <br><br> v. <br><br> **SPEAKER OF THE U.S. HOUSE OF REPRESENTATIVES, NANCY PELOSI,** *et al.*, <br><br> Defendants. | Case No. 1:22-cv-162 (TNM) |

<u>**MEMORANDUM OPINION**</u>

Robert Schilling requested emails and recordings from a committee of the U.S. House of Representatives.  He says those materials will show that the committee illicitly relied on unpaid private consultants when preparing for certain legislative hearings.  The House refused.  So Schilling sued, seeking compelled disclosure under the common law right of public access. Defendants now move to dismiss, arguing the Speech or Debate Clause bars Schilling's claims. Reviewing text, history, and precedent, the Court concludes the Clause acts as an absolute jurisdictional bar to suits seeking compelled disclosure of materials related to legislative activity. This case must be dismissed.

**I.**

This case arises from the House Committee on Oversight and Reform's ongoing work on climate change.  Amend. Compl. ¶ 14, ECF No. 12.  In recent years, the Committee held hearings to investigate the energy industry's business practices and research on fossil fuels.  *Id.* ¶ 17.  Schilling alleges that some committee members and their aides relied on unpaid "consulting services" in preparation for those hearings, violating federal law and House rules

prohibiting in-kind donations to cover congressional expenses.  *See id.* ¶¶ 18, 52–57; 31 U.S.C. § 1342.

Schilling sought to expose that allegedly unlawful alliance.  So he requested emails and recordings involving committee members, staffers, and some private parties.  *See* Amend. Compl. ¶ 68 (recounting the specific request).  Schilling submitted his request to the Clerk of the House, the Office of the Capitol Librarian, the Chief Administrative Officer of the House, the Speaker of the House, the Committee on Oversight and Reform, and Office of the General Counsel for the House (collectively, the House).  *Id.* ¶¶ 68–71, 78.

But the House rejected his request.  So he sued it under the common-law right of public access seeking a declaratory judgment and an injunction requiring disclosure.  *See* Amend. Compl. 38 (Prayer for Relief).  The House now moves to dismiss.  It claims the Speech or Debate Clause immunizes it from suits, like Schilling's, that seek records related to legislative activity.  *See id.* at 11–16; U.S. Const., art. I, § 6.  The Court held a motion hearing, and the motion is now ripe for resolution.

## II.

A complaint must contain "a short and plain statement of the grounds for the court's jurisdiction."  Fed. R. Civ. P. 8(a)(1).  A defendant may move to dismiss for failure to satisfy that requirement.  *See id.* 12(b)(1).  When it does, the Court must presume that "a cause lies outside [its] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and the plaintiff bears the burden of overcoming that presumption, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  While the Court accepts factual allegations in the complaint as true, those allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Nepal v. U.S. Dep't of State,* --- F. Supp. 3d ---,

2022 WL 1500561, at *3 (D.D.C. May 12, 2022).  And the Court "may consider materials

outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### III.

The text of the Speech or Debate Clause is straightforward:  "for any Speech or Debate in

either House, [Senators and Representatives] shall not be questioned in any other place."  U.S.

Const., art. I, § 6.

But to fully understand the Clause's meaning, let us start with its Anglo origins.  That

history confirms what modern courts have held:  Speech or Debate immunity is vital to the

legislative function and should be read broadly.

Of course, "English common-law practices and understandings . . . cannot be

indiscriminately attributed to the Framers of our own Constitution."  *N.Y. State Rifle & Pistol*

*Assoc. v. Bruen*, 142 S. Ct. 2111, 2136 (2022).  Thus, any historical analysis must recognize the

ways English and American legal traditions differ.

### A.

The Speech or Debate guarantee emerged out of a centuries-long conflict for English

parliamentary supremacy.  As early as 1377, the Speaker of the House of Commons petitioned

the Crown at the opening of each session, claiming various "ancient rights and privileges."

Carl Wittke, *The History of the English Parliamentary Privilege* 21 (1921).  But the Speaker's

Petition did not reference freedom of speech and debate until nearly two centuries later.  *Id.* at

23.  Parliament's growing ambition spurred the change:  beginning in the sixteenth century it

"engaged in a struggle with the Tudor and Stuart monarchs that precipitated its transformation

from little more than an advisory council to the supreme power in England."  Note, *The*

*Evidentiary Implications of the Speech or Debate Clause*, 88 Yale L. J. 1280, 1282–83 (1979). The Commons, in particular, began to assert control over "matters once thought to be within the Crown's exclusive domain, such as the conduct of foreign policy and the succession." Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1126 (1973).

Predictably, the Crown resisted, targeting members of parliament. In one early case, Richard Strode and other members were prosecuted for proposing bills to address corruption in the tin industry. *See* Leon R. Yankwich, *The Immunity of Congressional Speech—Its Origin, Meaning and Scope*, 99 Penn. L. Rev. 960, 963 (1951). Parliament responded with an Act declaring void proceedings against Strode and his colleagues "for any bill, speaking or declaring of any matter concerning the Parliament." Privilege of Parliament Act of 1512, 4 Hen. 8 c.8. But English courts disagreed as to whether that law applied only to Strode's case or more broadly, so the privilege remained "an act of grace on the part of the King." Yankwich, *Immunity of Congressional Speech*, *supra*, at 963 (emphasis omitted).

In another canonical case, John Eliot and fellow parliamentarians were convicted of seditious libel for giving speeches opposing royal abuses, including forced taxation. *See Eliot's Case*, 3 How. St. Tr. 294 (1629). Eliot's counsel argued the speech or debate privilege barred the suit: "Words spoken in Parliament, which is a superior court, cannot be questioned in this court, which is inferior." *Id.* at 295. But the King's Bench—royalist by definition—rejected Eliot's plea and imprisoned the defendants. Wittke, *supra*, at 30.

The struggle for parliamentary freedom of speech reached its zenith in a case involving Sir William Williams, Speaker of the House of Commons. *See Rex v. Williams*, 13 How. St. Tr. 1370 (1684–95). In the late-seventeenth century, Parliament received several "reports" detailing

4

an alleged plot to replace the King and make England a Catholic state.  *See generally* J. Pollock,

*The Popish Plot: A Study in the History of the Reign of Charles II* (1903).  Williams republished

one such report, levying "allegations against some of the most prominent members of the royal

court."  Reinstein & Silvergate, *Legislative Privilege*, *supra*, at 1130–31.  This displeased the

Crown; when James II later ascended to the throne, he ordered a libel suit filed against Williams.

*Id.* at 1131.

      Williams's counsel, Sir Robert Atkyns, argued parliamentary privilege barred the suit

altogether.  *See Williams's Case*, 13 How. St. Tr. at 1384.  Leaning on Parliament's longstanding

tradition, Sir Robert maintained that "enquiring" and "counseling" was a core part of

Parliament's function.  *See id.* at 1415 ("This enquiry of theirs is necessary in a subserviency to

all of the several high powers of that high court.  Namely, in order to their legislature, or to the

exercise of their power of judicature.").  And, he explained, publishing the coup report fell

within that enquiring role.  *See id.* at 1414.  Because parliamentarians have immunity for that

kind of official conduct, he argued, the suit against Williams should be dismissed.  Again, the

King's Bench rejected the plea of privilege.  It entered judgment against Williams and fined him

ten thousand pounds for "scandalous, infamous, flagitious libel."  *See Rex v. Williams*, 2 Show.

K.B. 471 (1686).

      But that was not the last word.  In 1688, the Glorious Revolution forced James II into

exile.  Soon after, Parliament secured the English Bill of Rights, including a now familiar

guarantee:

> that the freedom of speech and debates or proceedings in Parliament ought not to be
> impeached or questioned in any court or place out of Parliament.

1 W. & M., 2d sess., c.2 (1689).  The committee chair responsible for the Bill said the clause

"was put in for the sake of . . . Sir William Williams, who was punished out of Parliament for

what he had done in Parliament."  9 A. Grey, *Debates of the House of Commons* 81 (1763),

*reprinted in* Report from the Select Committee on the Official Secrets Act 24 (H.C. 1939).  The

privilege "was never again seriously questioned or denied."  Wittke, *supra*, at 30.

**B.**

The speech and debate privilege "successfully survived the journey across the Atlantic to

the American colonies."  John P. Moore, *In Search of Congress*, 52 St. Louis L.J. 253, 258

(2007).  English parliamentary precedent provided an experimental model from which "a whole

series of miniature Parliaments grew up on American soil."  Alexander J. Cella, *The Doctrine of*

*Legislative Privilege of Freedom of Speech and Debate*, 2 Suffolk L. Rev. 1, 14 (1968).  And

precisely because the doctrine was so well established, it "was taken as a matter of course by

those who severed the Colonies from the Crown."  *Tenney v. Brandhove*, 341 U.S. 367, 372

(1951).

In keeping with English practice, the Colonial Houses of Burgesses and Assemblies

recognized some form of speech and debate immunity.  *See* Yankwich, *Immunity of*

*Congressional Speech*, *supra*, at 965; Joseph Story, *Commentaries on the Constitution* § 863

(1833) (noting the privilege was "in full exercise in our colonial legislatures").  Nearly all state

constitutions adopted after independence protected freedom of speech and debate.  *See, e.g.*,

Mass. Const. pt. I, art. XXI (1780); N.H. Const. pt. I, art. XXX (1784).  And the Articles of

Confederation guaranteed it.  *See* Art. of Confed. of 1781, art. V ("Freedom of speech and debate

in Congress shall not be impeached or questioned in any Court, or place out of Congress.").

But the Framers were wary of legislative immunities.  Reinstein & Silverglate,

*Legislative Privilege*, *supra*, at 1136.  That care was born of experience.  By the Founding,

Parliament had "made such additions to their privileges and invented so many new ones" that

Englishmen had become "the victim of Parliamentary Tyranny."  Wittke, *supra*, at 17; *see also* 1 William Blackstone, *Commentaries* § 160 (1765) ("The privileges of parliament are likewise very large and indefinite . . . [and] its privileges were not certainly known to any but the parliament itself.").  The Framers "were determined no such authority should ever be exercised here."  Speech of Charles Pinckney in the U.S. Senate (March 5, 1800) *reprinted in III Records of the Federal Convention of 1787*, at 384 (M. Farrand ed. 1911).  And they drafted accordingly. Article I is "so express on the subjects of privilege from arrest, government of members, and expulsion" that "every man who has the least knowledge[] cannot misunderstand them."  *Id.*

Consider legislators' immunity from arrest.  In England, parliamentarians had sold "protections" from arrest as a source of income, and the practice became so widespread as to be a "serious menace to individual liberty and to public order."  Wittke, *supra*, at 39.  Responding to that experience, the new Constitution limits congressional privilege in two ways:  Members are immune only from arrest for certain crimes and only at certain times.  U.S. const., art. I, § 6, cl. 1.

Yet tellingly, there is no parallel limitation on the speech and debate privilege.  Unlike with other privileges, "freedom of speech or debate was placed in the Constitution virtually unchanged."  Reinstein & Silverglate, *Legislative Privilege*, *supra*, at 1138.  Indeed, Charles Pinckney proposed language almost identical to the English Bill of Rights.  *See* 3 *Records of the Federal Convention of 1787*, at 597 (M. Farrand ed. 1911) (Appendix D: The Pinckney Plan) ("Freedom of Speech & Debate in the legislature shall not be impeached or Questioned in any place out of it[.]").  The Committee of Detail offered a similar proposal, except that its version provided speech and debate would not be questioned "in any Court" besides any "place out of the Legislature."  3 *Documentary History of the Constitution of the United States* 447 (1900).

Both proposals were referred to the Committee of Style and Arrangement, which (without explanation) adopted the language of the current Speech or Debate Clause barring questioning "in any other place."  *See* 2 *Records of the Federal Convention*, *supra*, at 593.  Thus, despite the Framers' suspicion of legislative privileges, they adopted Speech or Debate immunity nearly wholesale.

There was little discussion of the draft Speech or Debate Clause, but two rejected proposals warrant mentioning.  Their ultimate rejection by the Convention underlines the expansiveness of the Clause and that courts—not Congress—must define it.

James Madison suggested positively defining the scope of immunity under the Clause, but the Convention rejected his proposal without a recorded vote or debate.  *See* 2 *Records of the Federal Convention*, *supra*, at 503.  At least some Framers believed defining the privilege *ex ante* would undermine its effectiveness.  James Wilson viewed the doctrine as dynamic:  "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary that he should enjoy the fullest liberty of speech."  2 *Works of James Wilson* 421 (McCloskey ed. 1967).

Across the Atlantic, Blackstone argued *against* defining legislative privileges: "[If] no privilege [were] to be allowed but what was so defined and determined, it were easy for the executive power to devise some new case, not within the line of privilege, and under pretence thereof to harass any refractory member and violate the freedom of parliament."  1 William Blackstone, *Commentaries* § 160 (1765).  Madison himself later reversed course—arguing that in applying Speech or Debate immunity "to emerging cases . . . the reason and necessity of the privilege must be the guide."  4 *Writings of James Madison* 221 (1865).

William Pinckney took a different approach.  He moved that "each House should be the judge of the privilege of its own members."  2 *Records of the Federal Convention*, *supra*, at 502. The Convention rejected that proposal, too, which makes sense given the structural differences between Parliament and Congress.  English parliamentary privileges grew out of Parliament's historic role as a high court.  *See* Reinstein & Silverglate, *Legislative Privilege*, *supra*, at 1122 ("Parliament's privileges originated in the fourteenth and fifteenth centuries out of a conception of Parliament as a *judicial body* . . . and a concomitant assertion that lower courts could not entertain actions challenging the propriety of deliberations in a higher court." (emphasis in original)).

By contrast, the new Congress would not be a high court.  The Constitution vests "the judicial power" in "one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const., art. III, § 1.  It also delineates the narrow adjudicative powers Congress retains, such as the authority to impeach and try public officials and to discipline its own members.  *See id.* art. I, § 2, cl. 5, § 3, cl. 6, § 5, cls. 1–2.  A fair inference from those structural designs is that the Constitution commits "judicial" functions like interpreting constitutional immunities to courts, not Congress.  *See The Federalist No.* 78, at 403-04 (Alexander Hamilton) (Carey and McClellan, eds., 2001) ("If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution. . . .  The interpretation of the laws is the proper and peculiar province of the courts.  A constitution is, in fact, and must be regarded by the judges, as a fundamental law."); *cf. United States v. Brewster*, 408 U.S. 501, 508 (1972) ("We should bear in

mind that the English systems differs from ours in that their Parliament is the supreme authority, not a coordinate branch.").

That view finds support in the immediate post-ratification period.  Consider *Coffin v. Coffin*, 4 Mass. 1 (1808), a case that delivered "the classic American formulation of the scope and extent of the [speech and debate] privilege."  Cella, *The Doctrine of Legislative Privilege*, *supra*, at 18.

There, William Coffin sued Micajah Coffin, alleging Coffin had slandered him in the Massachusetts legislature.  The Massachusetts Attorney General argued that the State constitution's speech or debate clause barred the suit.  *See Coffin,* 4 Mass. at 7; Mass. Const., art. XXI.  Only the legislature could determine the scope of its privilege: "[A]s to those privileges which are granted by the constitution to the two houses, such as freedom of deliberation, speech, and debate . . . that house is the supreme court, whose decision as to the nature and extent of the privileges, is final and conclusive."  *Id.* at 9.  But the state supreme court disagreed, concluding the scope of the privilege was a question of law, committed to the courts like any other.  *See id.* at 26–27 ("I know of no action within the jurisdiction of a court, and regularly before it, in which it will not be the duty of the judges to decide all matters of law arising in it, so far as the court is competent to decide on them.").

Of course, *Coffin* does not definitively answer why the Framers declined to vest Congress with power to define its speech and debate immunity.  *Cf. Bruen*, 142 S. Ct. at 2136 ("[W]e must [] guard against giving postenactment history more weight than it can rightly bear.").  But two things are clear—the Convention adopted the Committee of Style and Arrangement's proposed text unchanged.  And the States later ratified the new Constitution with "virtually no[]"

discussion of the Speech or Debate Clause.  Reinstein & Silverglate, *Legislative Privilege*, *supra*,

at 1136.  The final text of Article I, Section 6, cl. 1 read:

> The Senators and Representatives shall receive a Compensation for their Services,
> to be ascertained by Law, and paid out of the Treasury of the United States.  They
> shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged
> from Arrest during their Attendance at the Session of their respective Houses, and
> in going to and returning from the same; and for any Speech or Debate in either
> House, they shall not be questioned in any other Place.

## IV.

Precedent further clarifies the meaning of the Speech or Debate Clause.  The Supreme

Court and the D.C. Circuit have consistently interpreted the Clause functionally, seeking to

protect the legislative process from judicial and executive interference.  The thrust of those cases

is clear:  legislators and their aides have absolute immunity from compelled disclosure or

testimony related to legislative activities.

### A.

*Coffin* provided one of the earliest American articulations of legislative privilege.  Chief

Justice Parsons interpreted Massachusetts's speech and debate immunity in distinctly

functionalist terms:

> These privileges are thus secured . . . to support the rights of the people, by *enabling
> their representatives to execute the functions of their office* without fear of
> prosecutions, civil or criminal. I therefore think that *the article ought not to be
> construed strictly, but liberally, that the full design of it may be answered.*  I will
> not confine it to delivering an opinion, uttering a speech, or haranguing in debate;
> but will extend it to the giving of a vote, to the making of a written report, and to
> every other act resulting from the nature, and in the execution, of the office.

4 Mass. at 27 (emphasis added).  The Supreme Court relied on that definition when it first

considered the federal Clause's meaning.  *See Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)

("This is, perhaps, the most authoritative case in this country on the construction of the provision

in regard to freedom of debate in legislative bodies, and . . . is of much weight.").  And in

keeping with *Coffin*, later decisions have interpreted the immunity broadly to ensure legislative independence.

Some cases have struck down straightforward violations.  In *United States v. Johnson*, 383 U.S. 169 (1966), for example, a former congressman was convicted of making a speech on the House floor in exchange for a bribe.  *Id.* at 170–71.  During trial, the prosecution questioned Johnson extensively on how much of the speech he wrote, the reasons he included certain sentences, and his personal knowledge of the facts underlying the speech.  *Id.* at 173–74.  Unsurprisingly, the Court vacated Johnson's conviction as a violation of speech and debate immunity.  *Id.* at 184–85.

But other cases have applied the Clause beyond its literal terms.  Consider *Gravel v. United States*, 408 U.S. 606 (1972).  *Gravel* arose in the wake of the Pentagon Papers scandal. During a subcommittee meeting, Senator Mike Gravel placed an entire tranche of sensitive documents in the public record and his aides allegedly coordinated with a newspaper to publish them.  *Id.* at 609–10.  The Department of Justice then launched a criminal investigation into whether they violated federal record-retention laws.  *Id.* at 608.  As part of that investigation, a grand jury subpoenaed one of Senator Gravel's aides.  He intervened and moved to quash the subpoenas, arguing that requiring his aide to give testimony about the hearing would violate the Speech or Debate Clause.  *Id.* at 609.

The Government argued that the Clause does not protect congressional aides at all, noting it refers only to "Senators and Representatives."  *See id.* at 616.  The Court rejected that "cramped construction" as contrary to the immunity's "fundamental purpose"—namely, "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator."  *Id.* at 618.  It would be "literally impossible, in view of the complexities

of the modern legislative process . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants." *Id.* 616.  So, the Court held, Gravel's aides were immune from suit for activity "that would be immune legislative conduct if performed by the Senator himself." *Id.* at 622.

That begs a question—outside literal speech and debate, what qualifies as immune legislative conduct?  *Gravel* says the Clause covers activities that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings." *Id.* at 625.  The immunity attaches "even though [the] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973).

### B.

Applying these cases, the D.C. Circuit has held legislators and their aides have broad immunity from compelled disclosures related to legislative activity.  *See Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) ("The Supreme Court has consistently read the Speech or Debate Clause broadly to achieve its purposes.") (cleaned up).

Consider *MINPECO, S.A. v. Conticommodity Services,* 844 F.2d 856 (D.C. Cir. 1988). There, defendants in a civil proceeding sought to subpoena a congressional subcommittee.  *Id.* at 857.  The Hunts (the defendants) alleged the sought-after records would show that someone had altered their testimony before the subcommittee to impugn their reputation and credibility.  *See id.* at 857–58.  The subpoena sought disclosure of correspondence between the subcommittee, other congressional committees, and "any private litigants or their attorneys." *Id.* at 858.  The district court concluded the subpoenas were barred by Speech or Debate immunity and ordered them quashed.

The D.C. Circuit agreed—in its view, "the process by which a committee takes statements and prepares them for publication clearly qualifie[d] as an activity within the legislative sphere." *Id.* at 860 (cleaned up) (citing *McMillan*, 412 U.S. at 312–13).  Compelling disclosure would interfere with that responsibility by causing a "chilling effect" on the committee's preparation of legislative records.  *Id.* (quoting *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 528 (9th Cir. 1983)).  So quashing the subpoenas was appropriate.

Later cases have reaffirmed *MINPECO.  Brown & Williamson Tobacco Corporation v. Williams*, for example, relied on speech and debate immunity to quash a subpoena seeking stolen documents in possession of a congressional subcommittee.  *See* 62 F.3d 408, 423 (D.C. Cir. 1995).  It also clarified the rules for applying the immunity in two important ways:

*First*, it held the purpose for which Brown & Williamson sought the documents was irrelevant to whether speech and debate immunity barred enforcement of the subpoenas.  *See id.* at 419 ("[T]he only question was whether the subpoenas inquired into legislative conduct.").

*Second*, it held the "degree of disruption" the subpoenas caused on legislative activity was immaterial.  That is so because requiring "an initial judicial inquiry . . . to calibrate the degree to which a subpoena's enforcement would burden the committee's work would be absurd."  *Id.* at 419 (cleaned up).  As the Circuit reiterated, "the non-disclosure privilege for written materials . . . is [] absolute, and thus admits of no balancing."  *United States v. Rayburn House Office Building*, 497 F.3d 654, 662 (D.C. Cir. 2007).

\*     \*     \*

The structure of the Constitution, history, and binding precedent all teach the same principles:  Legislators and their aides have absolute immunity from compelled disclosure of records related to legislative activity.  Whether that immunity applies depends, in part, on

whether disclosure would interfere with an integral part of the deliberative and communicative processes by which Congress carries out its work.  It falls to courts, not Congress, to determine the scope of the immunity.  And where it attaches, courts have no subject matter jurisdiction to compel disclosure.

**V.**

Applying those principles here, Schilling's suit must be dismissed.  His request seeks documents and recordings directly related to a House committee's preparation for hearings on climate legislation.  Compelling disclosure of those documents would impede Congress's long-recognized investigatory function.  The Speech or Debate Clause prohibits that kind of inquiry.

**A.**

Start with the nature of Schilling's request.  He seeks records of conversations between members of Congress (and a committee aide) that also include private parties and state officials.  *See* Amend. Compl. ⁋ 68.  Those records will allegedly reveal a "public-private collaboration[] to deploy judicial or quasi-judicial functions of government against political opponents of the 'climate' agenda."  *Id.* ⁋ 19.  He says the private parties may have "advis[ed] the Committee investigation" while receiving funding from "activist donors" in hopes of "engineering referrals to the Department of Justice."  *Id.* ⁋⁋ 18, 23, 26.  But he appears to concede the Committee's inquiry at least *facially* falls within its jurisdiction.  *See id.* ⁋ 17 (noting the Committee has stated one of its "top legislative priorities is combating the increasingly urgent crisis of a changing climate").

Schilling's request implicates a core legislative activity—conducting investigative hearings on potential legislation.  *See McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) ("[I]nformation gathering . . . is essential to informed deliberation over proposed

15

legislation."); *Williams's Case*, 13 How. St. Tr. at 1415 ("without such enquiry, things of great importance may lie concealed").  True, the records Schilling requested reflect *preparation* for an investigative hearing, not the hearing itself.  But surely preparation for a hearing is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings."  *Gravel*, 408 U.S. at 625; *cf. MINPECO*, 844 F.2d at 860 ("the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity within the legislative sphere") (cleaned up).  To hold otherwise would ignore the reality of modern congressional work.

Compelling disclosure here would also trench on Congress's investigative function. Members and their aides would think twice before consulting with constituents or subject matter experts in anticipation of hearings.  *Cf. Brown & Williamson*, 62 F.3d at 420 ("[I]ndications as to what Congress is looking at provide clues as to what Congress is doing.").  More, litigating access requests like these would "create[] a distraction and force[] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975).  Perhaps the impact on Congress would be minor, but precedent is clear—"[t]he degree of disruption is immaterial."  *Brown & Williamson*, 62 F.3d at 419.[1]

---

[1]  Other courts in this district have reached the same conclusion on similar facts.  *See, e.g.*, *Jewish War Veterans of the U.S. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) ("To the extent that [Members'] communications, discussions, or other contacts . . . constitute information gathering in connection with or in aid of [] legislative acts, they are protected by the Speech or Debate Clause and need not be disclosed."); *United States v. Peoples Temple of the Disciples of Christ*, 515 F. Supp. 246, 249 (D.D.C. 1981) (quashing subpoena for House committee records because "producing documents . . . would certainly disrupt the functioning of a Member of Congress.").

Schilling says granting his request will not "hinder [] legislative purposes," but will instead "preserve the integrity of the legislative branch."  Opp. 10, ECF No. 15.  He offers two reasons why:

*First*, "Defendants include administrative and ministerial parties and not merely Members of the House and their respective aides."  *Id.*  That argument is odd.  Schilling concedes the Speech or Debate Clause applies to members and their aides.  *See id.* at 8.  He apparently believes litigants can evade that rule by simply naming an "administrative" or "ministerial" defendant alongside a covered individual.  That would be untenable—a plaintiff could obtain congressional records by simply adding a defendant from the House information technology office to a suit against a congressman.  That "administrative defendant" exception would swallow the immunity rule whole.  *Cf. MINPECO*, 844 F.3d at 862 (noting that while staff "may well be required, in appropriate situations, to testify as to the circumstances of an unprotected act, they may not be compelled to provide evidence that would compromise the protection extended by the Constitution to the legislative process itself").  Unsurprisingly, Schilling offers no authority for the proposition that such an exception exists.

*Second*, Schilling says the sought-after records "are not related to [Defendants'] duties as legislators" because "the objective of this use of Committee resources" is "to assist a campaign vow . . . to facilitate certain litigation."  Opp. 10; Amend. Compl. ¶ 22.  And he alleges the Defendants used congressional resources "in ways that violate House Rules and federal statutes . . . with an apparent motivation to assist *private* (non-legislative) ends."  Opp. 10 (emphasis in original).

This argument misunderstands Speech or Debate immunity.  Legislators' motives do not matter.  *Bogan v. Scott-Harris*, 523 U.S. 44, 54–55 (1998); *cf. Tenney*, 341 U.S. at 378 ("in times

of political passion, dishonest or vindictive motives are readily attributed to legislative conduct").  Instead, our inquiry is objective, focused on whether a suit implicates "an integral part of the deliberative and communicative process[]."  *Gravel*, 408 U.S. at 625.  That remains true even where legislators have allegedly acted unlawfully.  *See Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) ("An act does not lose its legislative character simply because a plaintiff alleges that it violated the House Rules, or even the Constitution.") (cleaned up).

In sum, Schilling's request seeks materials related to ongoing legislative hearings. Requiring Defendants to disclose those materials (if they exist) would chill Congress's investigative function.  The Speech or Debate Clause prohibits that kind of inquiry.

**B.**

One feature of this case warrants further discussion:  Schilling seeks disclosure under the common law right of access, not a subpoena.  He suggests courts should balance speech and debate immunity against the public's interest in disclosure when presented with this type of claim.  *Accord Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 998 (D.C. Cir. 2021) (Henderson, J., concurring in the judgment) ("I believe, in the right case, the application of the Speech or Debate Clause to a common law right of access claim would require careful balancing.").  The Court respectfully disagrees.

The Constitution structurally precludes balancing—to the extent a common law right conflicts with an express provision in the Constitution, the common law is void.  *See* U.S. Const., art. IV, cl. 2 (the Supremacy Clause); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803) ("[T]he particular phraseology of the constitution of the United States confirms and strengthens the principle . . . that a law repugnant to the constitution is void."); *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 628 (1834) (noting federal courts "derive no jurisdiction from the common law;

because the people of the United States, in framing their constitution, have thought proper to restrict them within certain limits").  The Constitution trumps common law principles.

And throughout history, speech and debate privilege has been understood as an absolute jurisdictional bar.  *See Williams's Case* 13 How. St. Tr. at 1384 ("[T]hese being matters transacted in parliament . . . this court ought not to take conasance of them; nor hath it any jurisdiction to judge or determine of them."); *Rangel*, 785 F.3d at 25 (affirming jurisdictional dismissal).  Engaging in a "balancing" of interests would subvert that jurisdictional limitation by subjecting Members and their aides to "the burden of defending themselves" on the merits. *Eastland*, 387 U.S. at 85.  Indeed, one of the primary functions of legislative immunity is to insulate the legislature from "accountability before a possibly hostile judiciary." *Johnson*, 383 U.S. at 180–81.

Thus, the Court holds the "non-disclosure privilege for written materials" is "absolute, and [] admits of no balancing."  *Rayburn*, 497 F.3d at 662; *accord Musgrave v. Warner*, 2022 WL 424589, at *4 (D.D.C. September 15, 2022) (rejecting a "fact-dependent" balancing test in common law right-of-access cases covered by the Speech or Debate Clause).[2]

_____

[2]  Query whether the common law right of access applies to Congress *at all*.  True, some courts have noted a "general rule" that "all three branches of government, legislative, executive, and judicial, are subject to the common law right."  *Wash. Leg. Found. v. U.S. Sent. Comm'n*, 89 F.3d 897, 903 (D.C. Cir. 1996) (quoting *Schwartz v. DOJ*, 435 F. Supp. 1203 (D.D.C. 1977).  That "general rule" appears to come from a 1977 district court decision, which in turn relied on a Kentucky Court of Appeals decision.  *See Schwartz*, 435 F. Supp. at 1203 (citing *Courier-Journal & Louisville Times Co. v. Curtis*, 335 S.W.2d 934, 936 (Ky. 1959)).  But that Kentucky case never held that the state legislature—much less Congress—is subject to the common law right of access.  It merely quoted a treatise for the proposition that "legislative, executive, and judicial" may be subject to a right of access.  *See* 335 S.W.2d at 936.  Indeed, neither *Washington Legal Foundation* nor *Schwartz* involved document requests to Congress—both involved requests to judicial or quasi-judicial bodies.  *See* 89 F.3d at 903; 435 F. Supp. at 1203.  Any suggestion that the common law right of access extends to Congress is therefore dicta, and not binding on this Court.

**VI.**

Because the Speech or Debate Clause deprives this Court of jurisdiction, Defendants'

Motion to Dismiss will be granted and the Amended Complaint dismissed.[3]  A separate Order

will issue.

Dated: October 3, 2022
                                    TREVOR N. McFADDEN, U.S.D.J.

---

[3]  Given this holding, the Court need not reach Defendants' alternative arguments for dismissal.